UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| GEORGE ELIAS, IV | : | |
| STEPHEN HADFORD | : | |
| and | : | |
| ROSS FOWLER | : | |
| Plaintiffs, | : | Civil Action No. |
| v. | : | Jury Trial Demanded |
| ROLLING STONE LLC | : | |
| SABRINA RUBIN ERDELY | : | COMPLAINT |
| and | : | |
| WENNER MEDIA LLC | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiffs George Elias, IV, Stephen Hadford, and Ross Fowler, by and through their undersigned counsel, hereby bring this Complaint against Defendants Rolling Stone LLC, Sabrina Rubin Erdely, and Wenner Media LLC, and in support thereof respectfully set forth as follows:

## INTRODUCTION AND SUMMARY OF THE ACTION

1.      Plaintiffs are suing for the defamation caused directly by the publication of the false and later retracted article in *Rolling Stone* magazine, entitled, "A Rape on Campus: A

Brutal Assault and Struggle for Justice at UVA" (hereinafter, "A Rape on Campus" or "the article"). *Rolling Stone*'s contributing Editor, Sabrina Rubin Erdely, wrote the article, which "generated worldwide headlines" and attracted public attention throughout the world, its online story attracting more than 2.7 million views. Defendants intended to show "what it's like to be on campus now ... where not only is rape so hostile but also that there's this pervasive culture of sexual harassment/rape culture." The article describes a gruesome and barbarous gang rape of a UVA freshman, "Jackie." The article alleges that Jackie was asked to Phi Kappa Psi's date party, at which she was led upstairs to a pitch-black room, thrown through a glass table, punched in the face, ambushed and violently raped by seven men for three hours, while her date, "Drew," helped conduct the rape as a fraternity initiation ritual. The article alleges that the participants in the gang rape were either brothers or rushees of Phi Kappa Psi. The article claimed that Jackie was told in the fall of 2014 that "all the boys involved have graduated," indicating that the alleged attackers were part of the class of 2013 and/or 2014. To further prove the inhumane culture and customs of Phi Kappa Psi and its members, Erdely and *Rolling Stone* claimed that two other young women had contacted Jackie and "confided that they, too, had recently been Phi Kappa Psi gang-rape victims."

2.     These statements and accusations of the events that occurred at Phi Kappa Psi are categorically false and have been disproved by publicly available information. In fact, Phi Kappa Psi did not have a party, date function, or gathering that night, Phi Kappa Psi did not participate in rush or have a pledge class in the fall semester, and no brother existed by the name of "Drew" or "Haven Monahan" (another fictitious name that Jackie claimed was Drew's real name). Moreover, no member of Phi Kappa Psi worked as a lifeguard at the University's Aquatic and

2

Fitness Center in 2012, nor does any member match the physical description of Drew in the

Rolling Stone account. The two women that Jackie alleged had been raped at Phi Kappa Psi

were never identified and their existence was never verified.

3.      Erdely and *Rolling Stone*'s allegations against the members of Phi Kappa Psi are

defamatory. By claiming that the men who participated in the alleged gang-rape were not only

participants in a Phi Kappa Psi fraternity initiation ritual, but also specifically 2013 and 2014

graduates, Erdely and *Rolling Stone* created a simple and direct way to match the alleged

attackers with Plaintiffs, as they are members of Phi Kappa Psi and UVA graduates of 2013.

This information was shown and listed on Plaintiffs' Facebooks, Phi Kappa Psi's website, and is

common knowledge amongst current and former UVA students.

4.      Specifically, Plaintiff George Elias, IV (hereinafter "Elias") lived in the fraternity

house in the first room at the top of the first flight of stairs at the time the alleged crime took

place. Based on the vivid details described in the Rolling Stone article, this room location was

the most likely scene of the alleged crime. Upon release of the article, family, friends,

acquaintances, coworkers, and reporters easily matched Plaintiff as one of the alleged attackers

and, among other things, interrogated him, humiliated him, and scolded him. Plaintiffs Hadford

and Fowler suffered similar attacks.

5.      Each of the Plaintiffs' names and hometowns were listed on publicly available

online blogs by anonymous users, identifying Plaintiffs as the participants in the alleged gang

rape. Those blogs still exist and Plaintiffs' names will forever be associated with the alleged

gang rape.

6.      Not surprisingly, these claims had a devastating effect on each of the Plaintiffs'

3

reputations. As young men who have dedicated their lives to obtaining the merits to attend

UVA, maintaining good grades and obtaining undergraduate degrees, while also becoming

involved in UVA activities, pledging a fraternity and finding lifelong brothers and friends,

Plaintiffs have been embarrassed to admit that they are members of Phi Kappa Psi as a direct

result of the article and its accusations. Moreover, Plaintiffs have received a wave of unwanted

attention, such as numerous postings on message boards and forums, constant texts, emails, and

questioning from peers and coworkers, and soliciting from reporters. Plaintiffs have each

suffered emotional turmoil, were entirely unable to focus at work and in school following the

release of the article, and are still being questioned often about the article's accusations.

## THE PARTIES

7.    Plaintiff George Elias, IV is an individual and resident of Arlington, Virginia. He

was a University of Virginia graduate and a member of the Phi Kappa Psi Fraternity. He is a

member of the University of Virginia class of 2013.

8.    Plaintiff Stephen Hadford is an individual and resident of Norfolk, Virginia. He

was a University of Virginia graduate and a member of the Phi Kappa Psi Fraternity. He is a

member of the University of Virginia class of 2013.

9.    Plaintiff Ross Fowler is an individual and resident of Charleston County, South

Carolina. He was a University of Virginia graduate and a member of the Phi Kappa Psi

Fraternity. He is a member of the University of Virginia class of 2013.

10.    Defendant Rolling Stone LLC is a privately held Delaware limited liability

company with its headquarters in New York, New York. Rolling Stone LLC has a sole member,

Wenner Media LLC. Rolling Stone LLC publishes Rolling Stone magazine in conjunction with

4

Wenner Media LLC.  Defendants Rolling Stone LLC and Wenner Media LLC are collectively

referred to herein as "*Rolling Stone*."  *Rolling Stone* published the false and defamatory article

about the members of Phi Kappa Psi on its website and in its December 2014 print edition of the

magazine.

      11.     Defendant Sabrina Rubin Erdely is a journalist and magazine reporter who is

employed as a Contributing Editor for *Rolling Stone* magazine.  Erdely is a resident of

Philadelphia, Pennsylvania. Erdely authored and published the defamatory article that falsely

accused the members of Phi Kappa Psi of a gang rape.

      12.     Defendant Wenner Media LLC is a privately held Delaware limited liability

company with its headquarters in New York, New York.  Wenner Media LLC publishes *Rolling

Stone* magazine in conjunction with Rolling Stone LLC, and also publishes *Us Weekly* and *Men's

Journal* magazines.  Defendants Rolling Stone LLC and Wenner Media LLC are collectively

referred to herein as "*Rolling Stone*."  *Rolling Stone* published the false and defamatory article

about the members of Phi Kappa Psi on its website and in its December 2014 print edition of the

magazine.

## JURISDICTION AND VENUE

      13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because

there is complete diversity of citizenship and the amount in controversy exceeds $75,000

exclusive of interest and costs.

      14.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §

1391. All defendants either reside or are employed in and may be found in the Southern District

of New York and a substantial part of the events giving rise to these claims occurred in this

district.

15.     Upon information and belief, all individuals aside from Erdely that contributed to the publication of the article reside in New York. Will Dana, managing editor of Rolling Stone, resides in the greater New York City area. Sean Woods, assistant managing editor and editor of the article, resides in New York, New York. Coco McPherson, head of the fact-checking department at Rolling Stone, and who read the final draft of the article before its publication, resides in New York, New York. Upon information and belief, the unknown fact-checker assigned to the article, who works in the fact-checking department at Rolling Stone and who works under McPherson, resides in New York and/or is employed in New York. Jann Wenner, publisher of Rolling Stone, who read a draft of the article before it was published, resides in New York. Natalie Krodel, in-house counsel for Wenner Media, who wrote a legal review of the article before its publication, resides in New York. Upon information and belief, Erdely worked with all of the above individuals in preparing and publishing the article.

16.     Rolling Stone LLC is a Delaware limited liability company, with its principal place of business in New York. (Affidavit signed by Natalie Krodel, General Counsel for Defendants, filed by the Defendants in the case *Eramo v. Rolling Stone LLC, et al.*, docket number 3:15-cv-00023 in the United States District Court for the Western District of Virginia ("Krodel Affidavit"), ¶ 3, a true and correct copy of which is attached hereto as Exhibit A.) The sole member of Rolling Stone LLC is Wenner Media LLC. (Id.)

17.     Wenner Media LLC is a Delaware limited liability company, with its principal place of business in New York. The sole member of Wenner Media LLC is Straight Arrow Publishers LLC. (Id. at ¶ 4.)

6

18.     Straight Arrow Publishers is a Delaware limited liability company, with its principal place of business in New York. Straight Arrow Publishers LLC has the following nine members: (1) Straight Arrow Publishers, Inc.; (2) the Jacob Eisner 2012 Trust 45; (3) the Sophie Eisner 2012 Trust 45; (4) the Robin Ruddell 2012 Trust 45; (5) the 2006 Wenner Family LLC; (6) Megan Kingsbury; (7) Jacob Eisner; (8) Sophie Eisner; and (9) the Kalei Wenner Irrevocable Trust.  (Id. at ¶ 5.)

19.     Straight Arrow Publishers Inc. ("SAP, Inc.") is a corporation incorporated in Delaware with its principal place of business in New York. SAP, Inc. is therefore a citizen of New York and Delaware.  (Id. at ¶ 6.)

20.     The Jacob Eisner 2012 Trust 45 is a trust. The trustees of the trust are Timothy Walsh and Benjamin Needell. Timothy Walsh is an individual who is a domiciliary of New Jersey and therefore is a citizen of New Jersey. Benjamin Needell is an individual who is a domiciliary of New York and therefore is a citizen of New York. The beneficiary of the trust is Jacob Eisner, a domiciliary of California and therefore a citizen of California. The Jacob Eisner Trust 45 is either a citizen of New York and New Jersey, or a citizen of New York, New Jersey, and California.  (Id. at ¶ 7.)

21.     The Sophie Eisner 2012 Trust 45 is a trust. The trustees of the trust are Timothy Walsh and Benjamin Needell. Timothy Walsh is an individual who is a domiciliary of New Jersey and therefore is a citizen of New Jersey. Benjamin Needell is an individual who is a domiciliary of New York and therefore is a citizen of New York. The beneficiary of the trust is Sophie Eisner, a domiciliary of Michigan and therefore is a citizen of Michigan. The Sophie Eisner 2012 Trust 45 is either a citizen of New York and New Jersey, or a citizen of New York,

New Jersey, and Michigan. (Id. at ¶ 8.)

22₁    The Robin Ruddell 2012 Trust 45 is a trust. The trustees o the trust are Timothy

Walsh and Benjamin Needell. Timothy Walsh is an individual who is a domiciliary of New

Jersey and therefore is a citizen of New Jersey. Benjamin Needell is an individual who is a

domiciliary of New York and therefore is a citizen of New York. The beneficiary of the trust is

Robin Ruddell, a domiciliary of Hawaii. The Robin Ruddell 2012 Trust 45 therefore is either a

citizen of New York and New Jersey, or a citizen of New York, New Jersey, and Hawaii. (Id. at

¶ 9.)

23.    The 2006 Wenner Family LLC is a Delaware limited liability company, with its

principal place of business in New York. The 2006 Wenner Family LLC has the following 13

members: (1) Jann S. Wenner; (2) Jane Wenner; (3) the 2004 Trust f/b/o A. Wenner; (4) the 2004

Trust f/b/o T. Wenner; (5) the 2004 Trust f/b/o E. Wenner; (6) Alexander Wenner; (7) Theodore

Wenner; (8) the A. Wenner 2005 Suc. II Trust; (9) the T. Wenner 2005 Suc. II Trust; (10) the G.

Wenner 2005 Suc. II Trust; (11) the Alex Wenner 2012 Trust 45; (12) the Theo Wenner 2012

Trust 45; and (13) the Gus Wenner 2012 Trust 45. (Id. at ¶ 10.)

      a.    Jann S. Wenner is individual who is a domiciliary of New York and

            therefore is a citizen of New York.

      b.    Jane Wenner is an individual who is a domiciliary of New York and

            therefore is a citizen of New York.

      c.    The 2004 Trust f/b/o A. Wenner is a trust. The trustees of the trust are

            Timothy Walsh and Benjamin Needell. Timothy Walsh is an individual

            who is a domiciliary of New Jersey and therefore is a citizen of New

8

Jersey. Benjamin Needell is an individual who is a domiciliary of New York and therefore is a citizen of New York. The beneficiary of the trust is Alexander Wenner, a domiciliary of New York and therefore is a citizen of New York. The 2004 Trust f/b/o A. Wenner therefore is a citizen of New York and New Jersey.

d.    The 2004 Trust f/b/o T. Wenner is a trust. The trustees of the trust are Timothy Walsh and Benjamin Needell. Timothy Walsh is an individual who is a domiciliary of New Jersey and therefore is a citizen of New Jersey. Benjamin Needell is an individual who is a domiciliary of New York and therefore is a citizen of New York. The beneficiary of the trust is Theodore Wenner, a domiciliary of New York and therefore a citizen of New York. The 2004 Trust f/b/o T. Wenner therefore is a citizen of New York and New Jersey.

e.    The 2004 Trust f/b/o E. Wenner is a trust. The trustees of the trust are Timothy Walsh and Benjamin Needell. Timothy Walsh is an individual who si a domiciliary of New Jersey and therefore a citizen of New Jersey. Benjamin Needell is an individual who is a domiciliary of New York and therefore is a citizen of New York. The beneficiary of the trust is Edward Wenner, a domiciliary of New York and therefore a citizen of New York. The 2004 Trust f/b/o E. Wenner therefore is a citizen of New York and New Jersey.

f.    Alexander Wenner is an individual who is a domiciliary of New York and

9

therefore is a citizen of New York.

g.   Theodore Wenner is an individual who is a domiciliary of New York and
     therefore is a citizen of New York.

h.   The A. Wenner 2005 Suc. II Trust is a trust.  The trustees of the trust are
     Timothy Walsh and Benjamin Needell.  Timothy Walsh is an individual
     who is a domiciliary of New Jersey and therefore is a citizen of New
     Jersey. Benjamin Needell is an individual who is a domiciliary of New
     York and is therefore a citizen of New York.  The beneficiary of the trust
     is Alexander Wenner, a domiciliary of New York and therefore a citizen of
     New York.  The A. Wenner 2005 Suc. II Trust therefore is a citizen of
     New York and New Jersey.

i.   The T. Wenner 2005 Suc. II Trust is a trust.  The trustees of the trust are
     Timothy Walsh and Benjamin Needell.  Timothy Walsh is an individual
     who is a domiciliary of New Jersey and therefore is a citizen of New
     Jersey.  Benjamin Needell is an individual who is a domiciliary of New
     York and is therefore a citizen of New York.  The beneficiary of the trust
     is Theodore Wenner, a domiciliary of New York and therefore a citizen of
     New York.  The T. Wenner 2005 Suc. II Trust therefore is a citizen of
     New York and New Jersey.

j.   The G. Wenner 2005 Suc. II Trust is a trust.  The trustees of the trust are
     Timothy Walsh and Benjamin Needell.  Timothy Walsh is an individual
     who is a domiciliary of New Jersey and therefore is a citizen of New

10

Jersey. Benjamin Needell is an individual who is a domiciliary of New York and is therefore a citizen of New York. The beneficiary of the trust is Edward Wenner, a domiciliary of New York and therefore a citizen of New York. The G. Wenner 2005 Suc. II Trust therefore is a citizen of New York and New Jersey.

k.  The Alex Wenner 2012 Trust 45 is a trust. The trustees of the trust are Timothy Walsh and Benjamin Needell. Timothy Walsh is an individual who is a domiciliary of New Jersey and therefore is a citizen of New Jersey. Benjamin Needell is an individual who is a domiciliary of New York and is therefore a citizen of New York. The beneficiary of the trust is Alexander Wenner, a domiciliary of New York and therefore a citizen of New York. The Alex Wenner 2012 Trust 45 therefore is a citizen of New York and New Jersey.

l.  The Theo Wenner 2012 Trust 45 is a trust. The trustees of the trust are Timothy Walsh and Benjamin Needell. Timothy Walsh is an individual who is a domiciliary of New Jersey and therefore is a citizen of New Jersey. Benjamin Needell is an individual who is a domiciliary of New York and is therefore a citizen of New York. The beneficiary of the trust is Theodore Wenner, a domiciliary of New York and therefore a citizen of New York. The Theo Wenner 2012 Trust 45 therefore is a citizen of New York and New Jersey.

m.  The Gus Wenner 2012 Trust 45 is a trust. The trustees of the trust are

11

Timothy Walsh and Benjamin Needell. Timothy Walsh is an individual who is a domiciliary of New Jersey and therefore is a citizen of New Jersey. Benjamin Needell is an individual who is a domiciliary of New York and is therefore a citizen of New York. The beneficiary of the trust is Edward Wenner, a domiciliary of New York and therefore a citizen of New York. The Gus Wenner 2012 Trust 45 therefore is a citizen of New York and New Jersey.

n.    Accordingly, the 2006 Wenner Family LLC is a citizen of New York and New Jersey.

24.    Megan Kinsbury is an individual who is a domiciliary of California and therefore is a citizen of California. (Id. at ¶ 11.)

25.    Jacob Eisner is an individual who is a domiciliary of California and therefore is a citizen of California. (Id. at ¶ 12.)

26.    Sophie Eisner is an individual who is a domiciliary of Michigan and therefore is a citizen of Michigan. (Id. at ¶ 13.)

27.    The Kalei Wenner Irrevocable Trust is a trust. The trustee of the trust is Steven Ruddell. Steven Ruddell is an individual who is a domiciliary of Hawaii and therefore is a citizen of Hawaii. The beneficiary of the trust is Seven Kamehameha. Seven Kamehameha has residences in both California and Hawaii. Depending on the year, Mr. Kamehameha's domicile switches between California and Hawaii, and therefore he is a citizen of either California or Hawaii. In no event does Mr. Kamehameha have any connection to Virginia. The Kalei Wenner Irrevocable Trust therefore is either a citizen of Hawaii, or a citizen of California and Hawaii.

12

(Id. at ¶ 14.)

28.    Accordingly, Straight Arrow Publishers LLC is, at most, a citizen of California,

Delaware, Hawaii, Michigan, New Jersey, and New York.  (Id. at ¶ 15.)

29.    Accordingly, Defendants Rolling Stone LLC and Wenner Media LLC are, at most,

citizens of California, Delaware, Hawaii, Michigan, New Jersey, and New York.  (Id. at ¶ 16.)

30.    Defendant Sabrina Rubin Erdely is an individual who is a domiciliary of

Pennsylvania and therefore is a citizen of Pennsylvania.  (Id. at ¶ 18.)

31.    Plaintiffs Elias and Hadford are individuals who are domiciliaries of Virginia, and

therefore are citizens of Virginia.

32.    Plaintiff Fowler is an individual who is a domiciliary of South Carolina, and

therefore is a citizen of South Carolina.

## THE FACTS

### Publication and Description of the Article

33.    On November 19, 2014, *Rolling Stone* published "A Rape on Campus: A Brutal

Assault and Struggle for Justice at UVA" on its website.  The article was also published in

*Rolling Stone*'s December 2014 issue.  Soon after its publication, the story attracted weeks of

national media attention including coverage by all of the national TV networks.

34.    The article detailed the story of a gang-rape of "Jackie," a UVA freshman who

was invited to dinner and a date function at Phi Kappa Psi by "Drew," a Phi Kappa Psi brother.

Drew worked at the UVA pool with "Jackie".  (Jackie later claimed that Drew's real name was

Haven Monahan, another one of Jackie's fabrications.)

35.    According to Erdely, at some point during the party, Drew suggested that he and

13

Jackie go upstairs "where it's quieter." Jackie was led up the stairs to a pitch-black room, where she bumped into someone and screamed. A man told Jackie to shut up and threw her through a glass table. When Jackie tried to bite one of the men's hands, he punched her in the face. Seven men proceeded to brutally rape Jackie for three hours while her date, Drew, conducted the gang rape and another man watched.

36.     The article alleges that the gang rape was one of Phi Kappa Psi's initiation rituals. The men encouraged each other to rape Jackie, yelling comments such as "Don't you want to be a brother?" and "We all had to do it, so you do, too." The article claims Jackie "remember[ed] every moment of the next three hours of agony..."

37.     The article alleges that at some point during the three hours, Jackie passed out, despite not having consumed any alcohol. When Jackie awoke, she found herself alone in the room, her dress "spattered with blood." Jackie quickly left the fraternity house using a side staircase where she was able to see that the "Phi Psi party was still under way," yet no one noticed her leaving.

38.     The article alleges that Jackie phoned three of her friends who ran to meet her on a nearby street corner, where "the Phi Kappa Psi house loomed behind them." The friends were identified by pseudonyms, "Randall," "Andy," and "Cindy" (whose real names are Ryan, Alex, and Kathryn). The friends debated "the social price of reporting Jackie's rape," as Cindy supposedly pointed out that "[they]'ll never be allowed into any frat party again." The friends ultimately decided to simply bring Jackie back to her dorm.

39.     The article alleges that, several months later, Jackie finally reported her alleged rape to Dean Nicole Eramo, only after Jackie was called in for a meeting with her academic

14

advisor because she failed three of her classes.

40.     The article alleges that, since the attack, Jackie has seen some of the men who raped her, including Drew, who has acted as if nothing happened. Drew even thanked her for a "great time" at the date party.

41.     The article also claims that two other women were victims of a gang rape at Phi Kappa Psi, but both women refused to comment and neither woman was ever identified as having even existed.

**The Article Contained Sufficient Identifying Facts to Match Plaintiffs as the Rapists**

42.     The article repeatedly identifies the Phi Kappa Psi house as the location of the alleged crime. The author also makes the statement, without any evidence, that Phi Kappa Psi is an "upper tier" frat with "a reputation of tremendous wealth."

43.     Drew was defined as a junior at UVA and Phi Kappa Psi brother, who led Jackie up to a bedroom at the top of the stairs, where the gang rape occurred. The article goes on to discuss in gruesome detail what Jackie allegedly endured for the next three hours by eight Phi Kappa Psi brothers and rushees, seven of which were rapists.

44.     The article claimed Jackie was told in the fall of 2014 that "all the boys involved have graduated," indicating that the alleged attackers were part of the class of 2013 and/or 2014.

45.     Plaintiff Elias was a Phi Kappa Psi brother and UVA graduate of the class of 2013. In 2012, the year of the alleged gang rape, Elias lived in the Phi Kappa Psi house in the first bedroom at the top of the first flight of stairs. Many of Elias's family, friends, and acquaintances knew that he lived in the first bedroom at the top of the stairs in 2012. All of Elias's coworkers knew of Elias's undergraduate at UVA and membership in Phi Kappa Psi, as

15

these facts were listed on Elias's resume.

46.     Plaintiff Hadford was also a Phi Kappa Psi brother and UVA graduate of the class of 2013. Prior to the release of the article, Hadford wore his Phi Kappa Psi shirts almost daily and represented to everyone that he was a Phi Kappa Psi brother. Upon applying to medical school, Hadford listed his involvement at UVA and his membership in Phi Kappa Psi on his American Medical College Application and resumes.

47.     Plaintiff Fowler was also a Phi Kappa Psi brother and UVA graduate of the class of 2013.

48.     Upon release of the article, many readers reasonably understood that the article referred to Plaintiffs' pledge class and immediately identified Plaintiffs Elias, Hadford and Fowler as three of the participants in the alleged gang rape.

49.     Plaintiffs were each identified by name and hometown on publicly available websites, such as FairFaxUnderground.com, a popular forum for residents of Fairfax County, Virginia to anonymously submit and read gossip about fellow Fairfax County residents. This website is publicly available throughout the world for anyone to access, view, and submit comments anonymously. In fact, any of Plaintiffs' names will render a search result of a single forum titled, "Culture of Rape at UVA profiled in Rolling Stone." Hundreds of horrific comments and accusations follow the listing of Plaintiffs' names.

50.     In a simple Google search of Plaintiff Hadford's first and last name, a link is titled, "Culture of Rape at UVA profiled in Rolling Stone" shows up on the first page.

51.     Plaintiffs Elias and Fowler listed Phi Kappa Psi on their social media outlets as a proud indication of their loyalty, brotherhood, and community involvement. Upon release of the

16

article, Plaintiffs were easily identified and established as the alleged rapists. Even after Plaintiffs removed all indications of Phi Kappa Psi membership, they continued to be identified in relation to the article.

52.     Plaintiff Hadford had a private Facebook page which had no identifying information or images - his only "friend" was his then-fiancée. Nevertheless, a reporter from The Guardian, Jon Swaine, was able to track Hadford down, message him on Facebook and solicit him following the release of the article.

### The Defamatory Statements in the Article Were False

53.     The Washington Post, believed to be a trustworthy source, inquired into the many discrepancies and questionable facts in the article. On December 5, 2014, it released an article titled, "Key elements of Rolling Stone's U-Va. Gang rape allegations in doubt" (hereinafter "the Washington Post article"), where it documented its findings.

54.     On December 5, 2014, *Rolling Stone*'s managing editor, Will Dana ("Dana"), issued a public apology on *Rolling Stone*'s website, stating that "in the face of new information, there now appear to be discrepancies in Jackie's account, and we have come to the conclusion that our trust in her was misplaced."

55.     Dana tweeted shortly after that he "can't explain the discrepancies between Jackie's account and the counter statements by Phi Psi" and that "the fact that there is a story that appears in Rolling Stone in which I don't have complete confidence is deeply unsettling to me."

56.     The Washington Post interviewed two of the students that came to Jackie's aid the night of the alleged attack. One student said that, although Jackie was clearly shaken up, "she did not appear physically injured at the time..." Another student identified as "Andy" in the

17

article, said that he and Jackie's two friends came to Jackie's aid on campus, about a mile away from the fraternity house. The allegations that Jackie was in a "bloody dress", with the Phi Kappa Psi house looming in the background, and that the students debated "the social price of reporting Jackie's rape" before advising against seeking help, were all inaccurate. The student identified as "Andy" in the article "did not notice any injuries or blood but said the group offered to get [Jackie] help. [Jackie], instead, wanted to return to her dorm, and he and the friends spent the night with her to comfort her at her request." Jackie did not identify any specific fraternity house at the time.

57.     Phi Kappa Psi did not host any event at the house during the weekend that the attack was alleged to have happened. The fraternity "reviewed the roster of employees at the university's Aquatic and Fitness Center for 2012 and found that it does not include a member of the fraternity... and that no member of the house matches the description detailed in the Rolling Stone account." In fact, the fraternity had no members who worked as lifeguards at the time. The fraternity also reviewed its social media archives and bank records and found no evidence of a date function or party on the night of the alleged attack.

58.     Phi Kappa Psi does not participate in rush and does not have pledges in the fall semester. Moreover, "no ritualized sexual assault is part of [its] pledging or initiating process."

59.     Alex Pinkleton, a rape survivor and friend of Jackie, stated that after her more recent conversations with Jackie, "she feels misled" about Jackie's story.

60.     Emily Renda, a rape survivor who introduced Jackie to Erdely, "said she learned months [after her initial conversation with Jackie] that Jackie had changed the number of attackers from five to seven." Renda stated, "I don't even know what I believe at this point."

18

61.     Phi Kappa Psi "has been vilified, vandalized and ultimately suspended on campus since Sabrina Rubin Erdely's Rolling Stone article went on line..."

62.     The Charlottesville Police Department conducted a formal investigation of the allegations in the *Rolling Stone* article and published its findings on March 23, 2015.  It noted that, "[h]aving exhausted all investigative leads, our investigation concludes that there is no substantive basis to support the account alleged in the Rolling Stone article."

63.     On April 5, 2015, *Rolling Stone* officially retracted "A Rape on Campus" and Dana issued an apology "to our readers and to all of those who were damaged by our story and the ensuing fallout, including members of the Phi Kappa Psi fraternity and UVA administrators and students."

**Erdely and *Rolling Stone* Were Negligent for Relying Only On Jackie, Their Subjectively Unreliable Sole Source of Information**

64.     On April 5, 2015, *Rolling Stone* produced a report by Steve Coll, dean of the Columbia School of Journalism, titled, "Rolling Stone and UVA: The Columbia University Graduate School of Journalism Report; An anatomy of a journalistic failure" (hereinafter "the Columbia Report"), which investigated "any lapses in reporting, editing and fact-checking behind the story."  The Columbia Report expands upon the doubts documented in the Washington Post article and is believed to be a true and trustworthy source of information.

65.     The Columbia Report's investigation revealed that the article was "a story of journalistic failure that was avoidable.  The failure encompassed reporting, editing, editorial supervision and fact-checking.  The magazine set aside or rationalized as unnecessary essential practices of reporting that, if pursued, would likely have led the magazine's editors to reconsider

19

publishing Jackie's narrative so prominently, if at all."

66.     Erdely had doubts about Jackie's credibility from the start. After her first
conversation with Jackie, Erdely "remembered being 'a bit incredulous' about the vividness of
some of the details Jackie offered, such as the broken glass from the smashed table." Thereafter,
"Jackie proved to be a challenging source. At times, she did not respond to Erdely's calls, texts
and emails."

67.     Jackie also "refused to provide Erdely the name of the lifeguard who had
organized the attack on her," and *Rolling Stone* proceeded with the story "without knowing the
lifeguard's name or verifying his existence."

68.     The Columbia Report found that Erdely had several ways to verify the factual
discrepancies in Jackie's story:

> Jackie told the writer that one of her rapists had been a party of a small discussion group
> in her anthropology class. Erdely might have tried to verify independently that there was
> such a group and to identify the young man Jackie described. She might have examined
> Phi Kappa Psi's social media for members she could interview and for evidence of a party
> on the night Jackie described. Erdely might have looked for students who worked at the
> aquatic center and sought out clues about the lifeguard Jackie had described. Any of
> those and other similar reporting paths might have led to discoveries that would have
> caused *Rolling Stone* to reconsider its plans.

69.     Defendants admitted that "their main fault was to be too accommodating of Jackie
because she described herself as the survivor of a terrible sexual assault." The Managing Editor
of *Rolling Stone* admitted that "[e]very single person at every level of this thing had opportunities
to pull the strings a little harder, to question things a little more deeply, and that was not done."
Yet, the Columbia Report noted:

> [T]he explanation that *Rolling Stone* failed because it deferred to a victim cannot
> adequately account for what went wrong. Erdely's reporting records and interviews with

20

participants make clear that the magazine did not pursue important reporting paths even when Jackie had made no request that they refrain. The editors made judgments about attribution, fact-checking and verification that greatly increased their risks of error but had little or nothing to do with protecting Jackie's interests.

### Erdely and *Rolling Stone* Were Negligent in Failing to Properly Seek Meaningful Comment From Those Associated With Phi Kappa Psi

70.     Erdely did not attempt to reach any of the eight participants in the alleged gang rape. Instead, Erdely contacted the UVA chapter president of Phi Kappa Psi, Stephen Scipione, writing only, "I've become aware of allegations of gang rape that have been made against the UVA chapter of Phi Kappa Psi. Can you comment on those allegations?" Erdely purposefully did not provide any other details to Scipione. "[Erdely] did not reveal Jackie's account of the date of the attack. She did not reveal that Jackie said Phi Kappa Psi had hosted a 'date function' that night, that prospective pledges were present or that the man who allegedly orchestrated the attack was a Phi Kappa Psi member who was also a lifeguard at the university aquatic center."

71.     Erdely was negligent at best, and intentionally malicious at worst, for seizing Scipione's opportunity to share his side of Jackie's story or discredit it, especially when "Jackie had made no request that [Erdely] refrain from providing such details to the fraternity." Scipione told the Columbia Report, "It was complete bullshit... They weren't telling me what they were going to write about. They weren't telling me any dates or details."

72.     Erdely also contacted Shawn Collinsworth, Phi Kappa Psi's national executive director at the time. Collinsworth was only able to volunteer "a summary of what UVA had passed on to the fraternity's leaders: that there were allegations of 'gang rape during Phi Psi parties' and that one assault 'took place in September 2012.'" Erdely claims that she assumed

21

Collinsworth "...already knew what the allegations were because they'd been told by UVA." However, Collinsworth was told by UVA of allegations "...quite different from and less detailed than the one Jackie had provided to Erdely." Erdely failed to tell Collinsworth "the details of the attack that ultimately appeared in *Rolling Stone*."

73.     Had Erdely provided more details to Scipione and Collinsworth of Jackie's allegations, "the fraternity might have investigated the facts she presented" and disprove Erdely's version with facts in direct contradiction, which the fraternity succeeded in doing after *Rolling Stone* published the article. The Columbia Report also notes that "[e]ven if *Rolling Stone* did not trust Phi Kappa Psi's motivations, if it had given the fraternity a chance to review the allegations in detail, the factual discrepancies the fraternity would likely have reported might have led Erdely and her editors to try to verify Jackie's account more thoroughly."

**Erdely and *Rolling Stone* Were Negligent in Failing to Seek Out the Trio That Came to Jackie's Aid on the Night of the Alleged Attack**

74.     Although Jackie spoke somewhat kindly about Ryan, Jackie's description of the students who came to her aid on the night of the alleged attack "was unflattering to all three former friends." The Columbia Report points out that "[j]ournalistic practice – and basic fairness – require that if a reporter intends to public derogatory information about anyone, he or she should seek that person's side of the story."

75.     Erdely made only two weak attempts to identify and contact the trio. She asked Alex Pinkleton, rape survivor and friend of Jackie, "for help in identifying or contacting the three. ...But Pinkleton said she would need to ask Jackie for permission to assist the writer. Erdely did not follow up with her." Erdely relied on Jackie instead, asking specifically for help

22

in speaking to Ryan, which Jackie never gave to Erdely. The Columbia Report found that "[i]t should have been possible for Erdely to identify the trio independently. Facebook friend listings might have shown the names. Or, Erdely could have asked other current students, besides Pinkleton, to help."

76. On September 11, 2014, at Jackie and Erdely's first in-person meeting, Jackie informed Erdely that she asked Ryan if he would be interested in talking to *Rolling Stone*. Ryan incredulously responded, "No! ... I'm in a fraternity here, Jackie, I don't want the Greek system to go down, and it seems like that's what you want to happen. ... I don't want to be a part of whatever little shit show you're running." Erdely worried that contacting Ryan or the other two students would drive Jackie away from cooperating with Erdely in producing the article. Yet, "Jackie never requested – then or later – that *Rolling Stone* refrain from contacting Ryan, Kathryn or Alex independently. ...Jackie never said that she would withdraw if Erdely sought out Ryan or conducted other independent reporting."

77. In fact, the Columbia Report reached Ryan Duffin, the same Ryan that came to Jackie's aid on the night of the alleged attack. "If Erdely had reached Ryan Duffin ... he would have said that he had never told Jackie that he would not participate in *Rolling Stone*'s 'shit show,'" and "[t]he entire conversation with Ryan that Jackie described to Erdely 'never happened'... Jackie never tried to contact him about cooperating with *Rolling Stone*. He hadn't seen Jackie or communicated with her since the previous April..."

78. Erdely admitted that, had she "learned Ryan's account that Jackie had fabricated their conversation, she would have changed course immediately, to research other UVA rape cases free of such contradictions..."

23

79.     The Columbia Report also reached Kathryn Hendley and Alex Stock, the other

two students who came to Jackie's aid on the night of the alleged attack. They said that "Jackie

told them that her date on Sept. 28 was not a lifeguard but a student in her chemistry class named

Haven Monahan..." and all three friends would have spoken to Erdely had she contacted them.

80.     The Columbia Report suggests that "[i]n hindsight, the most consequential

decision *Rolling Stone* made was to accept that Erdely had not contacted the three friends who

spoke with Jackie on the night she said she was raped. That was the reporting path, if taken, that

would have almost certainly led the magazine's editors to change plans."

## Plaintiffs Have Each Suffered Vicious and Hurtful Attacks Due To *Rolling Stone*'s and Erdely's False Claims About Them

### *Plaintiff George Elias, IV*

81.     Plaintiff Elias has suffered emotional turmoil as a result of the article. Upon

release of the article, Plaintiff Elias was immediately identified as one of the participants in the

alleged gang rape. Readers easily contacted and harassed him through social media, texts,

emails, and in person. Plaintiff Elias's parents and girlfriend were also repeatedly questioned

about his involvement in the allegations in the article.

82.     Plaintiff Elias has received a wave of unwanted attention, such as numerous

postings on message boards and forums, constant texts, emails, and questioning from peers and

coworkers, and soliciting from reporters. As a result of the article's accusations and the

following attacks by readers, Plaintiff was upset and entirely unable to focus at work, and is still

being questioned often about the article's accusations.

83.     Specifically, a few days after the article was released, Plaintiff Elias was solicited

daily for three consecutive days at his own home by reporter Taylor Shapiro of the Washington Post. Plaintiff Elias became nervous and distraught that reporters were easily able to find him and solicit him at his home.

84.     The day after the release of the article, Plaintiff Elias was questioned at lunch by a female coworker as to the allegations in the article. When Plaintiff Elias denied having any knowledge or involvement in the allegations of a gang rape, his coworker responded, "Well, you aren't telling me that you would accuse this girl of lying, now, would you?" in an accusatory tone.

85.     A female UVA alumnus and an employee working in the Human Resources department at Plaintiff's company asked Plaintiff which fraternity he was in at UVA. When Plaintiff informed her that he was a member of Phi Kappa Psi, she responded, "Oh... Well, you are a good person though, right?" in a skeptical and scornful tone. After the exchange, Plaintiff Elias wondered inwardly whether his job was in jeopardy.

86.     Throughout the next few weeks, Plaintiff Elias experienced similar instances and eventually pretended that he was never in a fraternity at UVA in order to avoid the constant humiliation and questioning he had endured.

87.     Following release of the article, Gail Gordon, a woman unknown to Plaintiff Elias, retweeted Plaintiff's tweets on Twitter (username: SatirclAlx) and reposted pictures of Plaintiff on her own Facebook page.

88.     Plaintiff Elias continued to receive messages from people of all different social groups asking about the article. It was clear that a number of those people's views of Plaintiff had changed and their respect for him diminished due to the allegations in the article. It was also

25

clear that others were skeptical, at the very least, about Plaintiff's involvement in the allegations.

89. For two months after the publication of the article, Plaintiff Elias endured, night after night, national news stories on the alleged rape. Almost every TV and news article led with a picture of the Phi Kappa Psi fraternity house prominently placed as the heading or "lead in" for the story. Each time Plaintiff viewed the fraternity house he once took such great pride in being a member of, he was forced to endure the emotional distress of seeing the broken window of his second floor bedroom, right at the top of the first flight of stairs, and knowing that the world thought he was a rapist.

90. Plaintiff Elias has removed his membership in Phi Kappa Psi from his resume, LinkedIn profile, and other social media.

91. Plaintiff Elias continues to receive unwanted attention from friends, family, acquaintances, and coworkers demanding updates on the article's allegations.

92. As a result of the article's allegations and all of the attacks thereafter by readers, Plaintiff Elias has suffered emotional anguish and was unable to focus at work for days at a time.

93. Plaintiff Elias has suffered irreparable harm to his reputation. He is still identified by name and hometown on FairFaxUnderground.com, which is still publicly available throughout the world for anyone to access, view, and submit comments anonymously. A search of "George Elias" will still result in a single link titled, "Culture of Rape at UVA profiled in Rolling Stone." Hundreds of horrific comments and accusations continue to follow the listing of Plaintiff Elias's name.

94. As a result, Plaintiff Elias's name will indefinitely be associated with the alleged gang rape that occurred at Phi Kappa Psi in 2012.

*Plaintiff Stephen Hadford*

95.     Plaintiff Hadford has suffered emotional turmoil as a result of the article. Upon

release of the article, Plaintiff Hadford was immediately identified as one of the participants in

the alleged gang rape. Readers easily contacted and harassed him through social media, texts,

emails, and in person.

96.     Specifically, Plaintiff Hadford had a private Facebook page which had no

identifying information or images - his only "friend" was his then-fiancée. Nevertheless, a

reporter from The Guardian, Jon Swaine, was able to track Hadford down, message him on

Facebook and solicit him following the release of the article.

97.     Plaintiff Hadford has received a wave of unwanted attention, such as numerous

postings on message boards and forums, constant texts, emails, and questioning from peers, and

soliciting from reporters. As a result of the article's accusations and the following attacks by

readers, Plaintiff was entirely unable to focus in school, and is still being questioned often about

the article's accusations.

98.     Plaintiff Hadford, now a medical school student, had obtained exceptional grades

throughout most of his educational career. In preparation for a crucial exam given a week after

the article was published, Plaintiff Hadford had extreme difficulty focusing and studying. This

exam was one of the handful of times Plaintiff Hadford had ever performed poorly in school, and

his overall grade in the course was affected.

99.     Plaintiff Hadford had to speak to his dean about the article and disclaim the

allegations. The article is common knowledge amongst Plaintiff's Masters class of sixty people,

as is Plaintiff's membership in Phi Kappa Psi.

100.    In or around April 2015, Plaintiff Hadford was volunteering at a memorial service for families of persons in an anatomy lab, where a young woman questioned him about the article and was convinced the allegations were true.

101.    For two months after the publication of the article, Plaintiff Hadford endured, night after night, national news stories on the alleged rape. Almost every TV and news article led with a picture of the Phi Kappa Psi fraternity house prominently placed as the heading or "lead in" for the story.

102.    As a result of the article's allegations and all of the attacks thereafter by readers, Plaintiff Hadford has suffered emotional anguish and was unable to focus at school for days at a time.

103.    Plaintiff Hadford continues to receive unwanted attention from friends, family, acquaintances, and coworkers demanding updates on the article's allegations.

104.    Plaintiff Hadford has suffered irreparable harm to his reputation. He is still identified by name and hometown on FairFaxUnderground.com, which is still publicly available throughout the world for anyone to access, view, and submit comments anonymously. A search of "Stephen Hadford" will still result in a single link titled, "Culture of Rape at UVA profiled in Rolling Stone." Hundreds of horrific comments and accusations continue to follow the listing of Plaintiff Hadford's name.

105.    On Google, Plaintiff Hadford's name still renders a search result with "Culture of Rape at UVA profiled in Rolling Stone" on the first page.

106.    As a result, Plaintiff Hadford's name will indefinitely be associated with the alleged gang rape that occurred at Phi Kappa Psi in 2012.

28

*Plaintiff Ross Fowler*

107.    Plaintiff Fowler has suffered emotional turmoil as a result of the article.  Upon release of the article, Plaintiff Fowler was immediately identified as one of the participants in the alleged gang rape.  Readers easily contacted and harassed him through social media, texts, emails, and in person.

108.    Upon release of the article, Plaintiff Fowler was devastated, embarrassed, and ashamed to confront his family and friends about his possible connection to the allegations in the article.

109.    Plaintiff Fowler has received a wave of unwanted attention, such as numerous postings on message boards and forums, constant texts, emails, and questioning from peers and coworkers, and soliciting from reporters.  For weeks following release of the article, Plaintiff Fowler received phone calls from unknown numbers, and continued to worry about the well-being of his fellow fraternity brothers, a number of whom he was very close with.

110.    Shortly after the release of the article, Plaintiff Fowler attended a social gathering of about forty people, many of whom were close family and friends who have known Plaintiff for most of his life.  Plaintiff was continuously questioned for the entirety of the evening and had to explain that he was not involved in the accusations of the article and had no knowledge of the alleged actions of Phi Kappa Psi.  It was a deeply distressing experience for Plaintiff, as it was obvious that these friends and family's thoughts and feelings towards Plaintiff drastically changed due to the allegations in the article.  This experience emotionally wrecked Plaintiff for the next several weeks.

111.    Plaintiff Fowler was questioned by his coworkers about the allegations in the

29

article, as it was common knowledge at the Residence Inn by Marriot (Plaintiff's place of business) that Plaintiff Fowler was in Phi Kappa Psi at UVA.

112.     Shortly after release of the article, Plaintiff Fowler attended a social gathering at his brother's house, where he was humiliated due to his membership in Phi Kappa Psi and his connection to the allegations in the article.

113.     Shortly after release of the article, Plaintiff Fowler was picking up Christmas gifts for his mother at a flower shop in Charleston, where he wore a UVA shirt. The female cashier immediately questioned him about his knowledge of the article, specifically whether he knew anybody in Phi Kappa Psi. Plaintiff denied having any association with the fraternity out of fear that he would be unfairly judged.

114.     Throughout the next few months, Plaintiff Fowler experienced similar instances and eventually began to deny that he was in any fraternity at UVA in order to avoid the constant humiliation and questioning he had endured, and the fear that others would unfairly make judgments about his character.

115.     For two months after the publication of the article, Plaintiff Fowler endured, night after night, national news stories on the alleged rape. Almost every TV and news article led with a picture of the Phi Kappa Psi fraternity house prominently placed as the heading or "lead in" for the story.

116.     As a result of the article's allegations and all of the attacks thereafter by readers, Plaintiff Fowler has suffered emotional anguish, stress, and humiliation.

117.     Plaintiff Fowler continues to receive unwanted attention from friends, family, acquaintances, and coworkers demanding updates on the article's allegations.

30

118.    Plaintiff Fowler has suffered irreparable harm to his reputation.  He is still

identified by name and hometown on FairFaxUnderground.com, which is still publicly available

throughout the world for anyone to access, view, and submit comments anonymously.  A search

of "Ross Fowler" will still result in a single link titled, "Culture of Rape at UVA profiled in

Rolling Stone."  Hundreds of horrific comments and accusations continue to follow the listing of

Plaintiff Fowler's name.

119.    As a result, Plaintiff Fowler's name will indefinitely be associated with the

alleged gang rape that occurred at Phi Kappa Psi in 2012.

120.    The false allegations in the Rolling Stone article accuse the Plaintiffs of crimes of

moral turpitude, and are defamation *per se*.

## COUNT ONE – DEFAMATION FOR STATEMENTS IN THE NOVEMBER 19, 2014
## ONLINE EDITION OF THE ROLLING STONE ARTICLE "A RAPE ON CAMPUS"

121.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully

herein.

122.    Erdely and *Rolling Stone* published "A Rape on Campus" on November 19, 2014.

The article was published to a worldwide audience on *Rolling Stone*'s website.

123.    The article contained the following false and defamatory statements concerning

Plaintiffs:

> • "Shut *up*," she heard a man's voice say as a body barreled into her,
> tripping her backward and sending them both crashing through a low glass
> table.  There was a heavy person on top of her, spreading open her thighs,
> and another person kneeling on her hair, hands pinning down her arms,
> sharp shards digging into her back, and excited male voices rising alla

31

round her. When yet another man clamped over her mouth, Jackie bit it, and the hand became a fist that punched her in the face. The men surrounding her began to laugh."

- "'Grab its motherfucking leg,'" she heard one voice say. And that's when Jackie knew she was going to be raped."

- "She remembers every moment of the next three hours of agony, during which, she says, seven men took turns raping her, while two more – her date, Drew, and another men – gave instruction and encouragement. She remembers how spectators swigged beers, and how they called each other nicknames like Armpit and Blanket. She members the men's heft and their sour reek of alcohol mixed with the pungency of marijuana. Most of all, Jackie remembers the pain and the pounding that went on and on."

- "As the last man sank onto her, Jackie was startled to recognize him: He attended her tiny anthropology discussion group. He looked like he was going to cry or puke as he told the crowd he couldn't get it up. 'Pussy!' the other men jeered. 'What, she's not hot enough to you?' Then they egged him on: 'Don't you want to be a brother?' 'We all had to do it, so you do, too.' Someone handed her classmate a beer bottle. Jackie stared at the young man, silently begging him not to go through with it. And as he shoved the bottle into her, Jackie fell into a stupor, mentally untethering from the brutal tableau, her mind leaving behind the bleeding body under assault on the floor."

- "She painfully arose from the floor and ran shoeless from the room. She emerged to discover the Phi Psi party still surreally underway, but if anyone noticed the barefoot, disheveled girl hurrying down a side staircase, face beaten, dress spattered with blood, they said nothing."

- "Since the Phi Kappa Psi party, she'd barely left her dorm room, fearful of glimpsing one of her attackers."

- "Jackie came across something disturbing: two other young women confided that they, too, had been victims of Phi kappa Psi gang rapes."

- "For months, Jackie had been assuaging her despair by throwing herself into peer education, but there was no denying her helplessness when she thought about Phi psi, or about her own alleged assailants still walking the grounds."

- "Of all her assailants, Drew was the one she wanted to see held

accountable – but with Drew about to graduate, he was going to get away with it."

- "Jackie tells me of a recurring nightmare she's been having, in which she's watching herself climb those Phi Kappa Psi stairs. She frantically calls herself to stop, but knows it's too late: That in real life, she's already gone up those stairs and into that terrible room, and things will never be the same. It bothers Jackie to know that Drew and the rest get to walk away as if nothing happened, but that she still walks toward that room every night – and blames herself for it during the day."

- "'Everything bad in my life is built around the one bad decision that I made,' she says. 'All because I went to that stupid party.'"

124. These statements are of and concerning Plaintiffs.

125. These statements are false.

- Phi Kappa Psi did not host a date party or event on the night that the attack was alleged to have happened.

- The fraternity does not include any members that worked at the university's Aquatic and Fitness Center for 2012 or worked as lifeguards at the time.

- Phi Kappa Psi does not participate in rush in the fall semester and does not have pledges in the fall semester.

- Phi Kappa Psi does not participate in a ritualized sexual assault as part of its initiation process.

- Neither "Drew" nor "Haven Monahan" is a real person. Both names were fabrications created by Jackie.

- The two women that Jackie alleged to have been victims of gang rape at Phi Kappa Psi were never identified or even verified to have existed.

33

126.    By such publication, Erdely and *Rolling Stone* caused harm to Plaintiffs' reputations and caused each Plaintiff emotional anguish.

127.    Erdely and *Rolling Stone*'s publication of these false statements was negligent at a minimum.

128.    Erdely and *Rolling Stone* had serious doubts about Jackie's credibility, yet continued to use her as the sole source of information.

129.    Erdely and *Rolling Stone* were negligent in not seeking meaningful comment from those associated with Phi Kappa Psi.

130.    Erdely and *Rolling Stone* were negligent in assuming that "Drew" was a member of Phi Kappa Psi.

131.    Erdely and *Rolling Stone* were negligent in failing to follow fundamental reporting practices and interview sources necessary for verifying the facts of Jackie's story.

132.    Erdely and *Rolling Stone* were negligent in deciding to publish "A Rape on Campus" while they knew, or should have known, that Jackie's story was extremely questionable at best, and outright false at worst.

133.    Erdely and *Rolling Stone*'s statements concerning the 2013 and 2014 UVA graduates of Phi Kappa Psi are defamatory because they easily led readers to identify Plaintiffs Elias, Hadford, and Fowler as the participants in the alleged gang rape.  These allegations foreseeably would hurt Plaintiffs in their professions and daily lives.

134.    *Rolling Stone* assigned Erdely, its Contributing Editor, to write the article, and she was acting within the scope of her employment when she published the false and defamatory statements in the article. *Rolling Stone* participated in, authorized, and ratified Erdely's conduct.

34

135.    The false allegations in the Rolling Stone article accuse the Plaintiffs of crimes of moral turpitude, and are defamation *per se*.

136.    As a direct and proximate result of these statements by Erdely and *Rolling Stone*, Plaintiffs have suffered damages, including, *inter alia*, injury to their reputations, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

**WHEREFORE,** Plaintiffs demand judgment in their favor in an amount in excess of $75,000.00, the exact amount to be determined at trial, plus interest, costs, attorney's fees, and punitive damages for Defendants' wanton, reckless, and intentional conduct.

## COUNT TWO – DEFAMATION FOR STATEMENTS IN THE DECEMBER 4, 2014 PRINT EDITION OF THE ROLLING STONE ARTICLE "A RAPE ON CAMPUS"

137.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

138.    Erdely and *Rolling Stone* published "A Rape on Campus" on November 19, 2014 on *Rolling Stone*'s website and in print on December 4, 2014.

139.    The article contained the following false and defamatory statements concerning Plaintiffs:

- "Shut *up*," she heard a man's voice say as a body barreled into her, tripping her backward and sending them both crashing through a low glass table. There was a heavy person on top of her, spreading open her thighs, and another person kneeling on her hair, hands pinning down her arms, sharp shards digging into her back, and excited male voices rising alla round her. When yet another man clamped over her mouth, Jackie bit it, and the hand became a fist that punched her in the face. The men surrounding her began to laugh."

- "'Grab its motherfucking leg,'" she heard one voice say. And that's when Jackie knew she was going to be raped."

35

- "She remembers every moment of the next three hours of agony, during which, she says, seven men took turns raping her, while two more – her date, Drew, and another men – gave instruction and encouragement. She remembers how spectators swigged beers, and how they called each other nicknames like Armpit and Blanket. She members the men's heft and their sour reek of alcohol mixed with the pungency of marijuana. Most of all, Jackie remembers the pain and the pounding that went on and on."

- "As the last man sank onto her, Jackie was startled to recognize him: He attended her tiny anthropology discussion group. He looked like he was going to cry or puke as he told the crowd he couldn't get it up. 'Pussy!' the other men jeered. 'What, she's not hot enough to you?' Then they egged him on: 'Don't you want to be a brother?' 'We all had to do it, so you do, too.' Someone handed her classmate a beer bottle. Jackie stared at the young man, silently begging him not to go through with it. And as he shoved the bottle into her, Jackie fell into a stupor, mentally untethering from the brutal tableau, her mind leaving behind the bleeding body under assault on the floor."

- "She painfully arose from the floor and ran shoeless from the room. She emerged to discover the Phi Psi party still surreally underway, but if anyone noticed the barefoot, disheveled girl hurrying down a side staircase, face beaten, dress spattered with blood, they said nothing."

- "Since the Phi Kappa Psi party, she'd barely left her dorm room, fearful of glimpsing one of her attackers."

- "Jackie came across something disturbing: two other young women confided that they, too, had been victims of Phi kappa Psi gang rapes."

- "For months, Jackie had been assuaging her despair by throwing herself into peer education, but there was no denying her helplessness when she thought about Phi psi, or about her own alleged assailants still walking the grounds."

- "Of all her assailants, Drew was the one she wanted to see held accountable – but with Drew about to graduate, he was going to get away with it."

- "Jackie tells me of a recurring nightmare she's been having, in which she's watching herself climb those Phi Kappa Psi stairs. She frantically calls herself to stop, but knows it's too late: That in real life, she's already gone

up those stairs and into that terrible room, and things will never be the same. It bothers Jackie to know that Drew and the rest get to walk away as if nothing happened, but that she still walks toward that room every night – and blames herself for it during the day."

- "'Everything bad in my life is built around the one bad decision that I made,' she says. 'All because I went to that stupid party.'"

140.    These statements are of and concerning Plaintiffs.

141.    These statements are false.

- Phi Kappa Psi did not host a date party or event on the night that the attack was alleged to have happened.

- The fraternity does not include any members that worked at the university's Aquatic and Fitness Center for 2012 or worked as lifeguards at the time.

- Phi Kappa Psi does not participate in rush in the fall semester and does not have pledges in the fall semester.

- Phi Kappa Psi does not participate in a ritualized sexual assault as part of its initiation process.

- Neither "Drew" nor "Haven Monahan" is a real person. Both names were fabrications created by Jackie.

- The two women that Jackie alleged to have been victims of gang rape at Phi Kappa Psi were never identified or even verified to have existed.

142.    By such publication, Erdely and *Rolling Stone* caused harm to Plaintiffs' reputations and caused each Plaintiff emotional anguish.

143.    Erdely and *Rolling Stone*'s publication of these false statements was negligent at a

37

minimum.

144.     Erdely and *Rolling Stone* had serious doubts about Jackie's credibility, yet continued to use her as the sole source of information.

145.     Erdely and *Rolling Stone* were negligent in not seeking meaningful comment from those associated with Phi Kappa Psi.

146.     Erdely and *Rolling Stone* were negligent in assuming that "Drew" was a member of Phi Kappa Psi.

147.     Erdely and *Rolling Stone* were negligent in failing to follow fundamental reporting practices and interview sources necessary for verifying the facts of Jackie's story.

148.     Erdely and *Rolling Stone* were negligent in deciding to publish "A Rape on Campus" while they knew, or should have known, that Jackie's story was extremely questionable at best, and outright false at worst.

149.     Erdely and *Rolling Stone*'s statements concerning the 2013 and 2014 UVA graduates of Phi Kappa Psi are defamatory because they easily led readers to identify Plaintiffs Elias, Hadford, and Fowler as the participants in the alleged gang rape.  These allegations foreseeably would hurt Plaintiffs in their professions and daily lives.

150.     *Rolling Stone* assigned Erdely, its Contributing Editor, to write the article, and she was acting within the scope of her employment when she published the false and defamatory statements in the article. *Rolling Stone* participated in, authorized, ratified, and condoned Erdely's conduct.

151.     The false allegations in the Rolling Stone article accuse the Plaintiffs of crimes of moral turpitude, and are defamation *per se*.

152.    As a direct and proximate result of these statements by Erdely and *Rolling Stone*, Plaintiffs have suffered damages, including, *inter alia*, injury to their reputations, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

**WHEREFORE,** Plaintiffs demand judgment in their favor in an amount in excess of $75,000.00, the exact amount to be determined at trial, plus interest, costs, attorney's fees, and punitive damages for Defendants' wanton, reckless, and intentional conduct.

## COUNT THREE - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

153.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if set forth fully herein.

154.    Defendants were, at the very least, negligent in publishing "A Rape on Campus" and negligent with regard to Plaintiffs as individuals that would be affected by the accusations in the article.

155.    Defendants did not exercise due care and recklessly disregarded standards of professional judgment by relying solely on Jackie, a subjectively unreliable source, and failing to seek and obtain meaningful comment from those associated with Phi Kappa Psi and the trio who came to Jackie's aid the night the attack was alleged to have happened.

156.    It was reasonably foreseeable that these negligent actions would cause the Plaintiffs mental anguish and severe emotional distress, as they are one of the handful of 2013 and 2014 UVA graduates who were members of Phi Kappa Psi.

157.    Defendants' negligence did in fact cause the Plaintiffs mental anguish and severe emotional distress, as well as irreparable injuries to their reputations, disruption to their daily lives, and other injuries.

158.   Erdely's conduct was performed within the scope of her employment. *Rolling Stone* participated in, authorized, ratified, and condoned Erdely's conduct.

**WHEREFORE,** Plaintiffs demand judgment in their favor in an amount in excess of $75,000.00, the exact amount to be determined at trial, plus interest, costs, attorney's fees, and punitive damages for Defendants' wanton, reckless, and intentional conduct.

Respectfully submitted,

Alan L. Frank, Esq.
Alan L. Frank Law Associates, P.C.
135 Old York Road
Jenkintown, PA 19046
215-935-1000
215-935-1110 (fax)
afrank@alflaw.net
Counsel for Plaintiffs

Date: July 29, 2015

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury for all counts.

Respectfully submitted,

Alan L. Frank, Esq.
Counsel for Plaintiffs

Date: July 29, 2015