UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
GEORGE ELIAS, IV, STEPHEN HADFORD
and ROSS FOWLER,

                                 Plaintiffs,

               -against-

ROLLING STONE LLC, SABRINA RUBIN
ERDELY and WENNER MEDIA LLC,

                                Defendants.
------------------------------------------------------------x

15-cv-5953 (PKC)

MEMORANDUM
AND ORDER

CASTEL, U.S.D.J.

           On November 19, 2014, Rolling Stone magazine ("Rolling Stone") published an article that described the violent gang rape of a University of Virginia ("UVA") freshman identified as "Jackie."  The parties do not dispute that the rape depicted in the article did not occur, and was the fictitious creation of "Jackie," the article's principal source.  Within five months of publication, Rolling Stone retracted the article and issued a written apology.  The since-discredited article included disturbing, graphic details about the rape, which was claimed to have occurred at the Phi Kappa Psi fraternity house at UVA.

           The plaintiffs are George Elias, IV, Stephen Hadford and Ross Fowler.  Plaintiffs were undergraduates at UVA and members of the Phi Kappa Psi fraternity when the attack purportedly occurred.  Each brings defamation claims against the article's author and the publishers of Rolling Stone.  None of the three plaintiffs was identified by name or physically described in the article.

           It should be emphasized that the three plaintiffs had no actual connection to the rape described in the article, and that their defamation claims are directed toward a report about

events that simply did not happen.  Plaintiffs allege that the article's references to attackers were "of and concerning" them, even though they also allege that the attackers were apparently invented by "Jackie."  In the plaintiffs' own words, any "apparent connection between the Plaintiffs and the allegations is an (unfortunate) coincidence."  (Opp. Mem. at 13.)  According to plaintiffs, the article nevertheless contained details that could prompt their friends, family and colleagues to erroneously infer that they participated in a gang rape.

Defendants move to dismiss the Second Amended Complaint (the "Complaint") pursuant to Rule 12(b)(6), Fed. R. Civ. P.  For the reasons explained, the article's details about the attackers are too vague and remote from the plaintiffs' circumstances to be "of and concerning" them.  The motion to dismiss is therefore granted.

BACKGROUND

For the purposes of this motion, all non-conclusory factual allegations are accepted as true, and all inferences are drawn in favor of the plaintiffs.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

A.  The Parties.

Elias, Hadford and Fowler were each members of Phi Kappa Psi, and each graduated from the University of Virginia in 2013.  (Compl't ¶¶ 7-9.)  Their individual allegations are discussed in greater detail below.

Defendant Sabrina Ruben Erdely was a contributing editor at Rolling Stone, and the author of the now-discredited article "A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA."  (Compl't ¶ 11.)  Defendant Rolling Stone LLC publishes Rolling Stone in conjunction with defendant Wenner Media LLC.  (Compl't ¶¶ 10, 12.)  The memberships of the two limited liability companies, Rolling Stone LLC and Wenner Media LLC, are alleged in

detail, and the Court is satisfied that it has subject matter jurisdiction on the basis of diversity of citizenship, 28 U.S.C. § 1332.  (Compl't ¶¶ 13-32.)

        B.  Overview of the "Jackie" Article.

On November 19, 2014, Rolling Stone published an online article titled, "A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA."  (Compl't ¶ 33.)  The article described a gang rape committed against "Jackie."[1]  (Compl't ¶ 34.)  It detailed how "Jackie" attended a dinner-and-date function at the Phi Kappa Psi house at the invitation of "Drew," a fraternity member who worked at the university swimming pool with "Jackie."  (Compl't ¶ 34.)  The article identified "Drew" as a junior at UVA.  (Compl't ¶ 43.)

According to the article, while at the party, "Drew" invited "Jackie" to an upstairs bedroom, where she was thrown through a glass table, punched in the face, penetrated with a beer bottle and forcibly gang raped by seven men while "Drew" and a ninth man observed.  (Compl't ¶¶ 35, 142.)  The article describes the attackers encouraging one unaroused participant to rape "Jackie" by uttering statements like, "Don't you want to be a brother?" and "We all had to do it, so you do, too."  (Compl't ¶¶ 36, 142.)  The article stated that "spectators swigged beers" and the attackers "called each other nicknames like Armpit and Blanket."  (Compl't ¶ 142.)  According to the article, "Jackie" eventually passed out and awoke with her dress "spattered with blood," at which point she exited the house via a side-staircase while the party was still underway.  (Compl't ¶ 37.)  "Drew" later thanked "Jackie" for a "great time" at the party, and the other purported attackers behaved toward her as if nothing had happened.  (Compl't ¶ 40.)

---

[1] All names appearing in quotation marks are the pseudonyms used in the Rolling Stone article.

Several months later, the article states, "Jackie" first reported the rape to UVA Dean Nicole Eramo. (Compl't ¶ 39.) The article states that two other women had been gang raped at the Phi Kappa Psi fraternity, but, according to the Complaint, "both women refused to comment and neither woman was ever identified as having even existed." (Compl't ¶ 41.) According to the article, in the fall of 2014, Dean Eramo told "Jackie" that "all the boys involved have graduated," implying that the alleged attackers graduated in 2013 or 2014. (Compl't ¶ 44.)

### C. The Article's Scrutiny and Retraction.

On December 5, 2015, the Washington Post reported on discrepancies and "questionable facts" in the article about "Jackie's" rape. (Compl't ¶ 72.) That same day, Rolling Stone's managing editor issued a public statement acknowledging "discrepancies in Jackie's account" and stating that "we have come to the conclusion that our trust in her was misplaced." (Compl't ¶ 73.) That editor also stated on Twitter that he "can't explain the discrepancies" in the article and that "I don't have complete confidence" in it. (Compl't ¶ 74.)

Under additional scrutiny, the account of "Jackie's" rape was revealed to be a fabrication. "Jackie's" friends disputed the article's version of events, the fraternity issued statements contradicting key details and the Charlottesville Police Department conducted a formal investigation into the incident. (Compl't ¶¶ 75-81.) On March 23, 2015, the Charlottesville Police Department stated that "[h]aving exhausted all investigative leads, our investigation concludes that there is no substantive basis to support the account alleged in the Rolling Stone article." (Compl't ¶ 81.) On April 15, 2015, Rolling Stone retracted "A Rape on Campus" and issued a written apology "to our readers and to all of those who were damaged by our story and the ensuing fallout, including members of the Phi Kappa Psi fraternity and UVA administrators and students." (Compl't ¶ 82.) A report authored by the dean of the Columbia

School of Journalism chronicled numerous lapses on the part of Rolling Stone, amounting to what the report described as a "journalistic failure" stemming from unquestioning acceptance of "Jackie's" account and a neglect of basic fact-checking practices. (Compl't ¶¶ 83-88.)

The Complaint alleges that no members of Phi Kappa Psi matched the physical description of "Drew," and it appears that "Drew" was not based on any real person. (Compl't ¶¶ 2, 144.) Plaintiffs claim that the fraternity had no party or social function on the night when the rape purportedly occurred, and that no fraternity member worked as a lifeguard at the university pool. (Compl't ¶¶ 2, 144.) The Complaint also alleges that the two additional women who "Jackie" claimed were gang raped at the fraternity were never identified, and that their existence has never been verified. (Compl't ¶¶ 2, 144.)

According to the plaintiffs, they have been listed as members of the UVA chapter of Phi Kappa Psi in an online bulletin board and are linked to the discredited Rolling Stone article via internet search engines. (Compl't ¶¶ 68-69.) They allege that even after removing all references to the fraternity from their social media profiles, they have been "easily identified and established as the alleged rapists." (Compl't ¶¶ 70-71.) The Complaint describes incidents in which they have been confronted by family, friends and colleagues or felt public embarrassment due to their association with Phi Kappa Psi and the unfounded suspicion that they may have been involved in the attack on "Jackie." (Compl't ¶¶ 100-139.)

D. The Complaint.

Plaintiffs bring three defamation claims. Count One alleges defamation as to the November 19, 2014 online edition of "A Rape on Campus." (Compl't ¶¶ 140-156.) Count Two alleges defamation as to the December 4, 2014 print edition of the article.[2] (Compl't ¶¶ 157-

---

[2] The parties have not asserted that there are material differences between the content of the article as it was published online and the version that appeared in print.

173.) Count Three alleges defamation as to comments that Erdely made in a podcast interview with the online publication Slate. (Compl't ¶¶ 174-183.) In alleging defamation, the plaintiffs assert that statements contained in the article and the podcast are "of and concerning" them. (Compl't ¶¶ 143, 160, 176.) Count Four of the Complaint alleges negligent infliction of emotional distress, which, as noted below, is voluntarily dismissed. (Compl't ¶¶ 184-90.)

RULE 12(b)(6) STANDARD.

To survive a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Legal conclusions are not entitled to the presumption of truth, and a court assessing the sufficiency of a complaint disregards them. Id. Instead, the Court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679. The Complaint must include non-conclusory factual allegations that "nudge[ ]" its claims "across the line from conceivable to plausible." Id. at 680 (quoting Twombly, 550 U.S. at 570)). "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

"[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits.'" Halebian v. Berv, 644 F.3d 122, 130 (2d Cir. 2011) (quoting Global Network Commc'ns, Inc. v. City of New York, 458 F.3d

150, 155 (2d Cir. 2006)).  A court reviewing a Rule 12(b)(6) motion "does not ordinarily look

beyond the complaint and attached documents in deciding a motion to dismiss brought under the

rule." Id.  A court may, however, "consider 'any written instrument attached to [the complaint]

as an exhibit or any statements or documents incorporated in it by reference . . . and documents

that the plaintiffs either possessed or knew about and upon which they relied in bringing the

suit.'" Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 100 (2d Cir. 2015) (quoting Rothman v.

Gregor, 220 F.3d 81, 88 (2d Cir. 2000)).

      The Complaint does not annex a copy of the Rolling Stone article, but it was

submitted by defendants as part of their motion to dismiss.  (Docket # 31 Ex. A.)  Because the

Complaint incorporates the article by reference and heavily relies upon it in bringing suit, it is

properly considered by the Court as part of this motion to dismiss. See, e.g., In re RadPro

SecurPass Scanner Cases, 2014 WL 4054310, at *3 (S.D.N.Y. Aug. 13, 2014) ("Because

Plaintiff explicitly referred to and relied on the article in his Complaint, the Court may consider

the ProPublica article when deciding Defendants' Motion to Dismiss.").

DISCUSSION.

    A. The "Of and Concerning" Requirement for Defamation Claims.

      The parties agree that New York law governs this case, and they rely only on New

York authority. See Def. Mem. at 10 n.3.  "Under New York choice of law rules . . . where the

parties agree that New York law controls, this is sufficient to establish choice of law." Fed. Ins.

Co. v. Am. Home Assurance Co., 639 F.3d 557, 566 (2d Cir. 2011).

      Under New York law, "[d]efamation is 'the making of a false statement which

tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil

opinion of him in the minds of right-thinking persons, and to deprive him of their friendly

intercourse in society.'" Stepanov v. Dow Jones & Co., 120 A.D.3d 28, 34 (1st Dep't 2014)

(quoting Foster v. Churchill, 87 N.Y.2d 744, 751 (1996)).  To state a claim for defamation, a

complaint must allege "(1) a false statement that is (2) published to a third party (3) without

privilege or authorization, and that (4) causes harm, unless the statement is one of the types of

publications actionable regardless of harm." Id. at 34.

       A plaintiff also must plausibly allege that "[t]he reading public acquainted with

the parties and the subject" would have understood the allegedly defamatory statement to be "of

and concerning" the plaintiff.  Carlucci v. Poughkeepsie Newspapers, Inc., 57 N.Y.2d 883, 885

(1982).  "It is not necessary that the world should understand the libel; it is sufficient if those

who know the plaintiff can make out that he is the person meant."  Geisler v. Petrocelli, 616 F.2d

636, 639 (2d Cir. 1980; quotation marks omitted; alteration in original).  A reader must be able to

discern that the statement refers to the plaintiff, even when the statement does not identify the

plaintiff by name.  See Three Amigos SJL Rest., Inc. v. CBS News Inc., 132 A.D.3d 82, 88 (1st

Dep't 2015) (if "the statement does not name the plaintiffs at all and contains nothing that would

cause a reader to think defendant was referring to them, the statement is not 'of and concerning'

the plaintiffs."); Salvatore v. Kumar, 45 A.D.3d 560, 563 (2d Dep't 2007) (article's reference to

actions of "executives and personnel" broadly did not support a claim that statement was "of and

concerning" plaintiffs); Giaimo v. Literary Guild, 79 A.D.2d 917, 917 (1st Dep't 1981) ("In

order for plaintiffs to be entitled to maintain an action for a defamatory statement, it must appear

that they are the persons concerning whom it was made.  It must be shown that the publication

was 'of and concerning' them.  It is not necessary that they be named in the publication, if the

allusion is apparent.").

       "A plaintiff bears the burden of pleading and proving that the asserted defamatory

statement designates the plaintiff in such a way as to let those who knew him understand that he

was the person meant." <u>Three Amigos</u>, 132 A.D.3d at 89 (quotation marks omitted). "The burden, it has been held, 'is not a light one.'" <u>Chicherchia v. Cleary</u>, 207 A.D.2d 855, 855 (2d Dep't 1994) (quoting <u>Geisler,</u> 616 F.2d at 639). "[W]here extrinsic facts are relied upon to prove such reference the party alleging defamation must show that it is reasonable to conclude that the publication refers to him or her and the extrinsic facts upon which that conclusion is based were known to those who read or heard the publication." <u>Id.</u> at 856; <u>see also</u> <u>Gristede's Foods, Inc. v. Poospatuck (Unkechauge) Nation</u>, 2009 WL 4547792, at *13 (E.D.N.Y. Dec. 1, 2009) (dismissing counterclaims that "do not set forth circumstances from which to infer that any of the Shinnecock defendants might be understood to have been the subject of the alleged defamatory statement . . . .")

Whether a complaint adequately alleges that a statement was "of and concerning" the plaintiff is generally a question of law for the Court. <u>See, e.g.</u>, <u>Three Amigos</u>, 132 A.D.3d at 88 (question of whether a "statement can be said to be 'of and concerning' that plaintiff may be decided as a matter of law and need not be determined by a jury."); <u>Springer v. Viking Press</u>, 60 N.Y.2d 916, 917 (1983) ("whether the complaint sufficiently alleges that the Lisa Blake, portrayed in that chapter as a whore, refers to plaintiff is a matter for the court . . . ."); <u>Church of Scientology Int'l v. Behar</u>, 238 F.3d 168, 173 (2d Cir. 2001) (issue of whether the disputed statement was "of and concerning" plaintiff "should ordinarily be resolved at the pleading stage . . . .").

### B.   Elias Does Not State a Claim for Defamation.

Elias was a Phi Kappa Psi member, and he graduated from UVA in 2013. (Compl't ¶ 45.) Elias alleges that the Rolling Stone article is defamatory and "of and concerning" him because he resided in the only bedroom where the purported rape could have

occurred.  In describing the location of "Jackie's" rape, the article includes the following

passage:

> "Want to go upstairs, where it's quieter?" Drew shouted into her ear,
> and Jackie's heart quickened.  She took his hand as he threaded them
> out of the crowded room and up a staircase.
> . . .
> Now, climbing the frat-house stairs with Drew, Jackie felt excited.
> Drew ushered Jackie into a bedroom, shutting the door behind them.

(Compl't ¶ 49.)

In 2012, the year that the rape was claimed to have occurred, Elias lived in the Phi

Kappa Psi house in the first bedroom at the top of the first flight of stairs.  (Compl't ¶ 45.)

According to the Complaint, Elias had the only room accessible on the second floor because the

other second-floor bedrooms were behind a door operated by an electronic keypad lock.

(Compl't ¶ 50.)  The Complaint alleges that the location of Elias's room was especially well

known because he lived there for two consecutive years, and that "[b]ased on the description in

the article, the only room to which Jackie could have been taken is Elias's room."  (Compl't ¶¶

51-52.)  The Complaint alleges that "[f]riends, family, and acquaintances of Elias would have

reasonably concluded that Jackie was raped in Elias's room."  (Compl't ¶ 54.)

These allegations do not plausibly allege that the events described in the article

are "of and concerning" Elias.

Elias's claim is based almost entirely on the fact that his bedroom was up a flight

of stairs and did not require entry via an electronic keypad lock.  (Compl't ¶¶ 45, 50.)  But the

article does not state or imply that there was any form of keypad lock or any other barrier that

distinguished one bedroom from another.  The Complaint itself alleges that there were several

additional bedrooms up that same flight of stairs.  (Compl't ¶ 50 ("On the second floor of the Phi

Kappa Psi house, only George Elias' room is accessible.  All the other second-floor rooms are

behind another door operated by an electronic keypad lock.").) The Complaint also alleges that Elias had one of three bedrooms on the second floor large enough to hold the ten people allegedly involved in the rape. (Compl't ¶ 53 ("Further, Elias' room was one of only three rooms on the second floor that were large enough to hold ten people.").)

As noted, the article does not mention the presence or absence of a keypad lock. It merely locates a bedroom "up a staircase" as the site of the purported rape. (Docket # 31 Ex. A.) The article contains no details that plausibly distinguishes Elias's bedroom from the several others on the second floor, even to those who knew extrinsic facts about the layout of the fraternity house. See, e.g., Chicherchia, 207 A.D.2d at 856.

Drawing every reasonable inference in favor of Elias, the Complaint plausibly alleges that he had one of several bedrooms on the second floor of the fraternity house, but it does not "designate[ ] [Elias] in such a way as to let those who knew him understand that he was the person meant." Three Amigos, 132 A.D.3d at 89. The article's reference to a bedroom up a flight of stairs "contains nothing that would cause a reader to think" that the article "was referring to [Elias]," id. at 88, nor is the claimed "allusion" to Elias "apparent," Giaimo, 79 A.D.2d at 917, even to individuals familiar with the layout of the fraternity house.

The Complaint therefore fails to plausibly allege that the rape described in the article was "of and concerning" Elias, whose defamation claims are dismissed.

    C.   Fowler Does Not State a Claim for Defamation.

        1.   Fowler's Involvement in the Fraternity's Rush Process.

According to the Complaint, the article "suggests" that all members of Phi Kappa Psi raped women as part of an initiation process. (Compl't ¶ 65.) The article includes quotes

purportedly made during the rape, including, "Don't you want to be a brother?" and "We all had to do it, so you do, too."  (Compl't ¶ 65.)

Fowler was a Phi Kappa Psi member, and graduated from UVA in 2013. (Compl't ¶ 47.)  In the 2010-2011 academic year, he was the fraternity's rush chair, and was also active in the rush process for the 2011-2012 academic year.  (Compl't ¶ 61.)  According to the Complaint, because the article "ma[de] the rape seem like an initiation ritual," the defendants "made it likely that reasonable readers would conclude that Fowler was involved in Jackie's rape and other rapes by virtue of his prominent role in initiating new members."  (Compl't ¶ 62.)  But plaintiffs read far too much into the words of the article, and rely on an interpretation that is at odds with the surrounding context created by the article.

Words "cannot be made [defamatory] by a strained or artificial construction." Golub v. Enquirer/Star Grp., Inc., 89 N.Y.2d 1074, 1076 (1997).  As stated by the New York Court of Appeals, "It has long been our standard in defamation actions to read published articles in context to test their effect on the average reader, not to isolate particular phrases but to consider the publication as a whole."  Immuno AG. v. Moor-Jankowski, 77 N.Y.2d 235, 250 (1991); see also Aronson v. Wiersma, 65 N.Y.2d 592, 594 (1985) ("The words must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader, and if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction."); James v. Gannett Co., 40 N.Y.2d 415, 420 (1976) ("The statement complained of will be read against the background of its issuance with respect to the circumstances of its publication," including "the whole scope and apparent object of the writer.") (quotation marks omitted).

The comments "Don't you want to be a brother?" and "We all had to do it, so you do, too," neither expressly state nor imply that the actions committed against "Jackie" were part of a fraternity-wide initiation ritual.  An interpretation of the comments that, at some point in the process of joining or pledging the fraternity, all aspiring members were required to commit an act of rape stretches the language beyond its plausible meaning and surrounding context.  "Don't you want to be a brother?" and "We all had to do it, so you do, too," are plausibly read as a boast – a type of perverse puffery – intended to encourage participation, not an actual pre-condition for membership.  The word "all," fairly construed, could refer to all of the men in the room at the time of the attack, and not all members of the fraternity.  Even the term "it" is ambiguous in context and does not necessarily refer to the crime of rape.

Plaintiffs' interpretation of the remarks would require the words to literally mean that in order to become a member of the organization, each and every member – said to exceed eighty individuals – committed a rape or gang rape, presumably in some provable way to those in charge of the admission process.  This would implicate more than eighty attackers and a similarly large number of victims.  But the article purports to recount the brutal gang rape of "Jackie," which was met with indifference from her peers and university administrators.  Even the article's title, "A Rape on Campus," places its focus on the experience of "Jackie," as opposed to an exposé of an organization with a membership-wide rape requirement.  One would expect that a report that more than eighty men were members of an organization requiring rape as a pre-condition for membership would bear a different title.  Viewed in the overall context of the article, the quotes cannot reasonably be construed to state or imply that the fraternity enforced a rape requirement as part of an initiation ritual or a pre-condition for membership.

Fowler's strained interpretation of the remarks does not "nudge[ ]" his claims "across the line from conceivable to plausible." Iqbal, 556 U.S. at 680. The Complaint does not plausibly allege that the remarks were "of and concerning" Fowler. The remarks do not "designate[ ] [Fowler] in such a way as to let those who knew him understand that he was the person meant," and the article "contains nothing that would cause a reader to think" that the article "was referring to [Fowler]." Three Amigos, 132 A.D.3d at 88, 89. Fowler's defamation claim is dismissed.

2.   Fowler's Status as an Avid Swimmer.

The Complaint also alleges that because Fowler was an avid swimmer who frequented the UVA aquatics center, readers would reasonably conclude that he was one of the rape's perpetrators. (Compl't ¶ 63.) The article states that "Jackie" met "Drew" when the two were "working lifeguard shifts together at the university pool." (Docket # 31 Ex. A.)

Fowler does not allege that he was a lifeguard – just that he often swam at the pool, sometimes as much as "several times per week" and at other times "every other week." (Compl't ¶ 63.) Moreover, the Complaint states that "no member of Phi Kappa Psi" worked as a lifeguard at UVA, and that no "member match[ed] the physical description of Drew in the Rolling Stone account." (Compl't ¶ 2.)

The article states that "Jackie" and "Drew" knew one another because they both worked the same shifts as lifeguards at the UVA pool, whereas Elias's claim is premised on the fact that he sometimes swam at the UVA pool. The article's discussion of "Drew's" lifeguard status does not "designate[ ] [Fowler] in such a way as to let those who knew him understand that he was the person meant." Three Amigos, 132 A.D.3d at 89. Similarly, "Drew's" lifeguard status "contains nothing that would cause a reader to think" that the article "was referring to

[Fowler]," id., 132 A.D.3d at 88, nor is the claimed "allusion" to Fowler "apparent," Giaimo, 79 A.D.2d at 917.

When the entire article is read in context, including the portions emphasized by Fowler, he fails to plausibly allege that the article's purported rape was "of and concerning" him. Fowler's defamation claims are dismissed.

### D. Hadford Does Not State a Claim for Defamation.

Hadford was a Phi Kappa Psi member, and he graduated from UVA in 2013. (Compl't ¶ 46.) According to the Complaint, he lived on campus for 15 months after graduation and worked at UVA's "emergency department." (Compl't ¶¶ 55, 56.) The Complaint alleges that Hadford "frequently rode his bike around campus . . . ." (Compl't ¶¶ 56, 59.)

Hadford's claims rely heavily on his practice of riding a bike through campus. The article summarizes a conversation that Jackie had with Dean Eramo, in which Eramo "revealed that she'd learned 'through the grapevine' that 'all the boys involved have graduated.' Both girls were mystified. Not only had Jackie just seen one of the boys riding his bike on the grounds but, as Alex pointed out, 'Doesn't that mean they're admitting something happened?'" (Compl't ¶ 57.) According to the Complaint, "Friends, family, and acquaintances of Hadford would have made the connection that Hadford must have been the person who Jackie saw riding his bike on campus." (Compl't ¶ 60.)

These allegations are insufficient to plausibly state a defamation claim. They assert that because "Jackie" had purportedly "just seen one of the boys riding his bike on the grounds," and because Hadford sometimes rode his bike on campus, the article was "of and concerning" him. The article contains no additional, identifying details concerning the individual who rode his bike around campus.

Based on the Complaint and the contents of the article, there is no basis from which Hadford could be distinguished from any other adult male riding his bike on the UVA campus. The article's statement that "Jackie" had recently observed a purported attacker on a bicycle "contains nothing that would cause a reader to think" that the article "was referring to [Hadford]," Three Amigos, 132 A.D.3d at 88, nor is the claimed "allusion" to Hadford "apparent," Giaimo, 79 A.D.2d at 917. The article's scant details concerning the bicyclist also do not "designate[ ] [Hadford] in such a way as to let those who knew him understand that he was the person meant." Three Amigos, 132 A.D.3d at 89.

The Complaint therefore fails to plausibly allege that the article was "of and concerning" Hadford, whose defamation claims are dismissed.

### E. The Additional Article Excerpts Quoted in the Complaint Do Not Support Plaintiffs' Defamation Claims.

The Complaint quotes several other excerpts from the article, which the plaintiffs allege were "of and concerning" them. (Compl't ¶¶ 142, 159.) These excerpts are often lengthy, and describe either events on the night of the purported attack or the distress that "Jackie" felt thereafter. Examples include, "She painfully arose from the floor and ran shoeless from the room. She emerged to discover the Phi Psi party still surreally underway, but if anyone noticed the barefoot, disheveled girl hurrying down a side staircase, face beaten, dress spattered with blood, they said nothing," "Since the Phi Kappa Psi party, she'd barely left her dorm room, fearful of glimpsing one of her attackers," and, "Of all her assailants, Drew was the one she wanted to see held accountable – but with Drew about to graduate, he was going to get away with it." (Compl't ¶¶ 142, 159.)

Such statements, and the several others block-quoted in the Complaint, are too general and attenuated to be "of and concerning" any of the three plaintiffs. They do not

describe the purported attackers or contain further information as to their identities. They "contain[ ] nothing that would cause a reader to think" that the article "was referring to [plaintiffs]," Three Amigos, 132 A.D.3d at 88, nor is any claimed "allusion" to plaintiffs "apparent" in the excerpts. Giaimo, 79 A.D.2d at 917. They also do not "designate[ ] the plaintiff[s] in such a way as to let those who knew [them] understand that [they were] the person[s] meant." Three Amigos, 132 A.D.3d at 89.

The Complaint's block quotes from the Rolling Stone article therefore do not plausibly allege that the article's rape was "of and concerning" plaintiffs, whose defamation claims are dismissed.

  F. <u>Plaintiffs' Defamation Claim Directed to the Slate Podcast Is Dismissed.</u>

Count Three of the Complaint alleges that Erdely defamed plaintiffs in a November 27, 2014 podcast interview with the online publication Slate, which is not a party to this action. (Compl't ¶¶ 174-83.) The Complaint quotes the following two comments that Erdely made during that interview:

> I mean I would think that the first thing that they would do is at least tell her, you know, this needs to go to the police, these are dangerous people who are hurting people – who are hurting people – if they hurt you, and you know, and she heard them saying things during the rape like oh, you know, you have to, you know egging – keep egging each other on saying things like "Don't you wanna be a brother?" which seems to indicate that this is some kind of initiation ritual.

(Compl't ¶ 175.)

> I would speculate that life inside of a frat house is a – probably – you know, you have this kind of communal life where everybody's sort of sharing information, it's a very – it's a life where, you know, people are living their lives very closely with one another. And, um, it seems impossible to imagine that people didn't know about this, that some people didn't know about this, maybe not everybody – it's a fairly large fraternity – there's something like 82 brothers in the

> fraternity now, currently in there – But it seems impossible to imagine that people did not know about it.

(Compl't ¶ 175.)  The Complaint alleges that these statements are "of and concerning" the plaintiffs.  (Compl't ¶ 176.)

"Under New York law, expressions of pure opinion, as opposed to statements of fact, are not actionable, and receive full constitutional protection."  Restis v. American Coalition Against Nuclear Iran, Inc., 53 F. Supp. 3d 705, 718 (S.D.N.Y. 2014).  "When the defendant's statements, read in context, are readily understood as conjecture, hypothesis, or speculation, this signals the reader that what is said is opinion, and not fact."  Levin v. McPhee, 119 F.3d 189, 197 (2d Cir. 1997).  In discerning whether a statement is a fact or opinion, New York law considers a non-exclusive list of factors that include:

> (1) an assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact.

Steinhilber v. Alphonse, 68 N.Y.2d 283, 292 (1986).  If the speaker implies that a statement is based on undisclosed facts, this may weigh strongly against classifying a statement as an opinion.  See, e.g., Guerrero v. Carva, 10 A.D.3d 105, 114 (1st Dep't 2004).  "In New York, resolution of the fact/opinion issue is a matter for the court."  Levin, 119 F.3d at 196.

While Erdely's remarks go toward matters that could be objectively proven or disproven – e.g., whether the attack on "Jackie" was part of an initiation ritual and whether other fraternity members knew about the incident – her statements were phrased in a way that readily identified them as speculation and hypothesis.  In discussing whether the attack on "Jackie" was

part of an initiation ritual, Erdely qualified her observations by saying that a comment purportedly uttered during the attack "seems to indicate" that the rape was "some kind of initiation ritual." (Compl't ¶ 175.) As to the knowledge that other fraternity members may have had about the incident, Erdely began her remarks with the qualification, "I would speculate that . . ." before stating generalized views about "this kind of communal life" at fraternities. (Compl't ¶ 175.) Erdely eventually concluded that, while "maybe not everybody . . . it seems impossible to imagine that people did not know about it." (Compl't ¶ 175; emphasis added.) Erdely's statements were heavily qualified, and expressed in a manner "readily understood as conjecture, hypothesis, or speculation . . . ." Levin, 119 F.3d at 197.

Additionally, the statements do not imply that they were based on undisclosed facts. Erdely's remarks about the membership's knowledge of the incident was based on generalized observations of what it was "probably" like to live in a fraternity house. (Compl't ¶ 175.) Erdely repeated a quote that, she stated, "seems to indicate" that the attack was part of an initiation ritual. (Compl't ¶ 175.) This is not an instance when a disputed statement relied on facts not disclosed to the reader. See, e.g., Guerrero, 10 A.D.3d at 114 (flyers accusing defendant of criminality and racism were actionable in part because they directed recipients to "call for facts").

Because Erdely's remarks in the Slate podcast were expressly couched as speculation or hypothesis, they are non-actionable opinions, and Count Three of the Complaint is dismissed.

G. <u>Plaintiffs Do Not Plausibly Allege "Small Group" Defamation.</u>

    1.  <u>Erdely's Comments Do Not Give Rise to a "Small Group Defamation" Claim.</u>

       Each of the Complaint's three defamation claims includes an allegation that the plaintiffs were defamed because certain statements led readers to believe that rape was "part of an initiation ritual" at the fraternity. (Compl't ¶¶ 152, 169, 179.)  The Complaint also alleges that Erdely's remarks in the Slate podcast falsely led listeners to believe that all then-members of Phi Kappa Psi at UVA "had guilty knowledge of Jackie's rape." (Compl't ¶ 179.)  They argue that Erdely's interview comments and the text of the article, combined, gave readers the false impression that gang rape was an initiation ritual required of all Phi Kappa Psi members, thereby making the statements "of and concerning" the individual plaintiffs and all other then-members of UVA's Phi Kappa Psi chapter. (Opp. Mem. at 16-21.)

       These allegations go to what New York courts have sometimes described as a "small-group libel" claim.  <u>See</u>, <u>e.g.</u>, <u>Haefner v. New York Media LLC</u>, 82 A.D.3d 481, 482 (1st Dep't 2011).  For such claims, if a group is sufficiently small and a statement defames all of its members, "courts have permitted an unnamed member of a group to maintain a claim for defamation where a defamatory statement has been made against the group." <u>Algarin v. Town of Wallkill</u>, 421 F.3d 137, 139 (2d Cir. 2005); <u>see also</u> <u>Haefner</u>, 82 A.D.2d at 482 ("vague reference to a 'NYPD/DEA strike force' failed to provide sufficient identifiers sufficient to make it 'of and concerning' plaintiffs so as to avail them of the small-group libel doctrine.").  The concept of "small group defamation" or "small group libel" in New York law was applied in <u>Brady v. Ottaway Newspapers</u>, 84 A.D.2d 226 (2d Dep't 1981), which concluded that a newspaper editorial imputing universal criminality to 53 unnamed, unindicted police officers could be "of and concerning" each unnamed officer.  <u>Brady</u> concluded that "[b]ecause the group is small and

includes few individuals, reference to the individual plaintiff reasonably follows from the statement and the question of reference is left for the jury." Id. at 231. "Often the size of a group is critical to the sufficiency of a claim by an unnamed member of a group," and "'the cases in which recovery has been allowed usually have involved numbers of 25 or fewer.'" Algarin, 421 F.3d at 139 (quoting Restatement (Second) of Torts § 564A cmt. b. (1977)).

Plaintiffs' arguments rely heavily on Erdely's comments in the Slate podcast, and contend that Erdely both stated that the fraternity used gang rape as an initiation practice and imputed knowledge of the "Jackie" rape to all members. (Opp. Mem. at 16-19.) However, as discussed, Erdely's remark that the purported comments during the incident "seems to indicate that this is some kind of initiation ritual" was phrased as speculation and hypothesis. Similarly, her discussion of "life inside of a frat house" was expressly qualified by the phrase, "I would speculate . . ." and consisted of little more than generalizations about how Erdely imagined "this kind of communal life where everybody's sort of sharing information . . . ." (Compl't ¶ 175.)

Because Erdely's comments were couched as speculation and hypothesis, they do not support plaintiffs' claim of small-group defamation.

2. Additional Statements Cited by Plaintiffs Do Not Support Their Claims.

Plaintiffs' opposition memo also lifts quotes from the article that references the fraternity's negative reputation on campus, UVA's formal investigation into the fraternity, and "Jackie's" uncorroborated statement that two other women had been gang raped at the fraternity.[3] (Opp. Mem. at 17-18.) Plaintiffs also cite to the quotes "Don't you want to be a

---

[3] Examples that plaintiffs cite include, ". . . although they were appalled by Jackie's story, no one voiced questions about UVA's strategy of doing nothing to warn the campus of gang-rape allegations against a fraternity that still held parties and was rushing a new pledge class," "Given the swirl of gang-rape allegations Eramo had now heard against one of UVA's oldest and most powerful fraternities . . . the school may have wondered about its responsibilities to the rest of the campus," and ". . . having learned of Rolling Stone's probe into Jackie's story, UVA at last placed Phi Kappa Psi under investigation." (Opp. Mem. at 17.)

brother?" and "We all had to do it, so you do, too," to argue that the article depicted rape as an initiation ritual required of all members. (Opp. Mem. at 18.)

While the statements may portray Phi Kappa Psi in a negative light, they do not expressly or impliedly state that the fraternity required all initiates to participate in a rape, or impute any knowledge of such a requirement to the plaintiffs. They therefore fail to state a claim of small-group defamation.

### 3. Plaintiffs' Status as Recent Graduates Does Not Give Rise to a Small-Group Defamation Claim.

Plaintiffs argue that the article singles them out as part of a smaller group-within-a-group because the article quotes Dean Eramo as stating that "all the boys involved have graduated." (Opp. Mem. at 19-20.) Plaintiffs' opposition memo explains as follows: "if the Court found it necessary to analyze the facts under the theory that the Plaintiffs are members of a group (31 members of the classes of 2013 and 2014), the Court should conclude that there was a high degree of suspicion attached to each Plaintiff as a potential rapist, and sustain the Plaintiffs claims." (Opp. Mem. at 21.) According to the plaintiffs, readers could conclude that they were personally involved in the rape because, as graduates of the class of 2013, they fall into this more limited subset of all Phi Kappa Psi members.

This argument fails, however, because in order to state a claim for "small group defamation," the defamatory statement must apply to all members of the group. See Algarin, 421 F.3d at 140 (dismissing small-group defamation claim when alleged defamation applied to only "some" members of the group and not "all" members); Brady, 84 A.D.2d at 787 (discussing editorial's assertion that all of the department's unindicted police officers had engaged in criminality). Under plaintiffs' argument, they were three among the 31 individuals who could have been included in Dean Eramo's statement about recent graduates. Dean Eramo did not state

that all recent graduates from Phi Kappa Psi were involved in the "Jackie" rape or had participated in similar behavior as an organizational practice or initiation requirement.

Because the allegedly defamatory statement did not apply to all 31 members of the class of 2013 or 2014, but only to an unidentified subset, it does not support plaintiffs' claims for "small group defamation."

### H. Plaintiffs' Claim for Negligent Infliction of Emotional Distress Is Voluntarily Dismissed.

Defendants move to dismiss plaintiffs' claim for negligent infliction of emotional distress on the grounds that it is duplicative of their defamation claims. In opposition, Plaintiffs "acknowledge that the emotional distress claim depends on substantially the same facts as the defamation claims, and accordingly Plaintiffs do not object to dismissal of the emotional distress claim as duplicative." (Opp. Mem. at 21.)

Plaintiffs' claim for negligent infliction of emotional distress is therefore voluntarily dismissed.

CONCLUSION.

For the foregoing reasons, the defendants' motion to dismiss is GRANTED. (Docket # 29.) The Clerk is directed to terminate the motion and enter judgment for the defendants.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
      June 28, 2016